Lynn M. THOMSON, Plaintiff–Appellant,

v.

Allan S. LARSON, Nanette Larson, and Julie Larson McCollum, Defendants–Appellees.

Docket No. 97–9085.

United States Court of Appeals, Second Circuit.

Argued March 26, 1998.

Decided June 19, 1998.

Russell Alexander Smith, Law Offices of Russell Alexander Smith, P.C., New York City, for Plaintiff–Appellant.

L. Peter Parcher, Parcher, Hayes & Liebman, New York City (Orin S. Snyder, Amy R. Gutman, of counsel), for Defendants–Appellees.

* The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Nancy E. Wolff, Cavallo & Wolff, New York City (Jordan Rossen, Peggy Marks, of counsel), for Amici Curiae, The National Writers Union and Literary Managers and Dramaturgs of the Americas, Inc., in support of Plaintiff–Appellant.

Laurence T. Sorkin, Kevin J. Burke, Cahill Gordon & Reindel, New York City (Richard Garmise, Christopher C. Wilson, Ralph Sevush, The Dramatists Guild, Inc., New York City, of counsel), for Amicus Curiae, The Dramatists Guild, Inc., in support of Defendants–Appellees.

Before FEINBERG, CALABRESI, and BRIGHT,* Circuit Judges.

CALABRESI, Circuit Judge:

Plaintiff-appellant Lynn Thomson claims that, along with principal playwright Jonathan Larson,[1] she co-authored a "new version" of the critically acclaimed Broadway musical *Rent.* Since Thomson and Larson did not specify their respective rights by contract, this case raises two issues: (1) whether *Rent* qualifies as a statutory "joint work," co-authored by Thomson; and (2) whether, even if Thomson is not deemed a co-author, she automatically retains exclusive copyright interests in the material she contributed to the work. The first question is squarely answered by the nuanced co-authorship test announced in *Childress v. Taylor,* 945 F.2d 500 (2d Cir.1991), and, on that basis, we affirm the district court's conclusion that Thomson is not a co-author of *Rent.* The second question—ownership of a copyright (in the absence of any written contract) in a "non-co-author's" contribution to a work—was not addressed in *Childress.* Because Thomson did not plead infringement of any such putative copyright interest, however, this issue is not properly before us, and so we do not decide it.

## BACKGROUND

The facts given below and found by the district court are essentially uncontested.

1. Mr. Larson is now deceased.

*Rent,* the Pulitzer Prize and Tony Award-winning Broadway modern musical based on Puccini's opera *La Bohème,* began in 1989 as the joint project of Billy Aronson and composer Jonathan Larson. Aronson and Larson collaborated on the work until their amicable separation in 1991.[2] At that time, Larson obtained Aronson's permission to develop the play on his own. By written agreement, Larson promised that the title would always be "RENT a rock opera by Jonathan Larson. Original concept and additional lyrics by Billy Aronson." In return, Aronson agreed that he would "not . . . be considered [an] active collaborator or co-author of RENT."[3]

In the summer of 1992, Larson's *Rent* script was favorably received by James Nicola, Artistic Director of the New York Theatre Workshop ("NYTW"), a non-profit theater company in the East Village. Larson continued to develop and revise the "workshop version" of his *Rent* script. In the spring of 1993, Nicola urged Larson to allow the NYTW to hire a playwright or a bookwriter to help revamp the storyline and narrative structure of the play. But Larson "absolutely, vehemently and totally rejected [Nicola's] suggestion of hiring a bookwriter" and "was insistent on making RENT entirely his own project." Larson received a grant in the spring of 1994 to pay for a workshop production of *Rent,* which was presented to the public in the fall of 1994 in a series of ten staged performances produced by the NYTW and directed by Michael Greif.[4] "[T]he professional consensus concerning the show, after the studio production, was that it was, at a minimum, very promising and that it needed a great deal of work." Artistic Director Nicola once again suggested to Larson that

he consider working with a bookwriter, which Larson "adamantly and steadfastly refused, consistently emphasizing his intention to be the only author of RENT."

In May 1995, in preparation for *Rent*'s off-Broadway opening scheduled for early 1996, Larson agreed to the NYTW's hiring of Lynn Thomson, a professor of advanced playwrighting at New York University, as a dramaturg[5] to assist him in clarifying the storyline of the musical. Thomson signed a contract with the NYTW, in which she agreed to provide her services with the workshop production from May 1, 1995, through the press opening, scheduled for early February of 1996. The agreement stated that Thomson's "responsibilities shall include, but not be limited to: Providing dramaturgical assistance and research to the playwright and director." In exchange, the NYTW agreed to pay "a fee" of $2000, "[i]n full consideration of the services to be rendered" and to provide for billing credit for Thomson as "Dramaturg." The Thomson/NYTW agreement was silent as to any copyright interests or any issue of ownership with respect to the final work.

In the summer and fall of 1995, Thomson and Larson worked extremely intensively together on the show. For the most part, the two worked on the script alone in Larson's apartment. Thomson testified that revisions to the text of *Rent* didn't begin until early August 1995. Larson himself entered all changes directly onto his computer, where he kept the script, and Thomson made no contemporaneous notes of her specific contributions of language or other structural or thematic suggestions. Thomson alludes to the "October Version" of *Rent* as the culmination

---

2. During that time, from 1989–1991, the names of both Larson and Aronson appeared on the title pages of *Rent* drafts (in identical typeface). After their separation, Larson moved Aronson's credit from the title page to the final page of the *Rent* scripts.

3. Larson agreed that Aronson would be compensated at "the standard going rate" if the play ever made any money. Aronson later transferred his copyrights to the heirs of Jonathan Larson in exchange for four percent of the authors' share of royalties.

4. At this point, Larson did not have any contract with the NYTW, nor had the theater obtained any production rights in the play.

5. Dramaturgs provide a range of services to playwrights and directors in connection with the production and development of theater pieces. According to Thomson's testimony, the role of the dramaturg "can include any number of the elements that go into the crafting of a play," such as "actual plot elements, dramatic structure, character details, themes, and even specific language."

of her collaborative efforts with Larson. That new version was characterized by experts as "a radical transformation of the show."

A "sing-through" of the "October Version" of *Rent* took place in early November 1995. And on November 3, 1995, Larson signed a contract with the NYTW for ongoing revisions to *Rent*. This agreement identified Larson as the "Author" of *Rent* and made no reference to Thomson. The contract incorporated by reference an earlier draft author's agreement that set forth the terms that would apply if the NYTW opted to produce *Rent*. The earlier draft author's agreement gave Larson approval rights over all changes in text, provided that any changes in text would become his property, and assured him billing as "sole author." [6]

The final dress rehearsal was held on January 24, 1996. Just hours after it ended, Larson died suddenly of an aortic aneurysm. Over the next few weeks, Nicola, Greif, Thomson, and musical director Tim Weil worked together to fine-tune the script.[7] The play opened off-Broadway on February 13, 1996, to rave reviews. On February 23, *Rent*'s move to Broadway was announced. Since its opening on Broadway on April 29, 1996, the show has been "an astounding critical, artistic, and commercial success."

Before the Broadway opening, Thomson, in view of her contributions to *Rent*, sought

compensation and title page dramaturgical credit from the Broadway producers. And on April 2, 1996, she signed a contract in which the producers agreed to pay her $10,000 plus a nominal $50/ week for her dramaturgical services. Around the same time, upon the producers' advice, Thomson approached Allan S. Larson, Nanette Larson, and Julie Larson McCollum ("Larson Heirs"), the surviving members of Jonathan Larson's family, to request a percentage of the royalties derived from the play. In a letter to the Larson family, dated April 8, 1996, Thomson stated that she believed Larson, had he lived, would have offered her a "small percentage of his royalties to acknowledge the contribution I made." In reply, the Larson Heirs offered Thomson a gift of 1% of the author's royalties. Negotiations between Thomson and the Larson Heirs, however, broke down.[8]

After the parties failed to reach a settlement, Thomson brought suit against the Larson Heirs,[9] claiming that she was a co-author of *Rent*[10] and that she had never assigned, licensed, or otherwise transferred her rights. Thomson sought declaratory relief and a retroactive and on-going accounting under the Copyright Act. Specifically, she asked that the court declare her a "co-author" of *Rent* and grant her 16% of the author's share of the royalties.[11]

---

**6.** On November 30, 1995, Larson signed an option deal with the Broadway producers. This contract defined the royalty payments and other entitlements that would flow to Larson as "Author."

**7.** All four agreed that they would not claim authorship in any of the material created during this time. Accordingly, before *Rent* opened off-Broadway, Nancy Dickmann, Managing Director of the NYTW, asked each of them to sign waivers disclaiming any copyright interest in the material they contributed. Thomson alone refused.

**8.** This offer was subsequently doubled (to 2%), according to the Larson Heirs, in response to Thomson's requests and her mention of health problems. According to the Larson Heirs, Thomson rejected this offer, and further communications ended after Thomson demanded the right to use the *Rent* libretto in a book that she planned to write. In any event, the parties stated at oral argument that the offer of 2% of royalties has been withdrawn.

**9.** Appellees, the Larson Heirs, succeeded to Larson's rights and interests in *Rent*.

**10.** Thomson's amended complaint alleges that "she developed the plot and theme, contributed extensively to the story, created many character elements, wrote a significant portion of the dialogue and song lyrics, and made other copyrightable contributions to the Work."

**11.** Thomson claims that she seeks 16% of the proceeds "because of her respect for Larson's role as the principal creator of the work." Thomson derives the 16% figure in the following way: she alleges that 48% of the Rent script is new in relation to the 1994 Workshop version (prior to her involvement); as co-author, she is, therefore, entitled to 50% of this part (or 24% of the total revenues); but since there are three components to Rent (book, lyrics, and music) and she did not contribute to one (music), she is entitled to 2/3, or 16% of the total revenues. Brief for Plaintiff–Appellant at 49–50. Thomson also sought the right to quote freely from various

A bench trial was held in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge* ) from July 18–23, 1997. Judge Kaplan considered the testimony of over two dozen witnesses, as well as thousands of pages of documentary evidence, including *Rent* scripts, playbills, production notes, journal entries, and correspondence. In a decision rendered from the bench, Judge Kaplan concluded that Thomson was not a joint author of *Rent* and dismissed the remainder of Thomson's complaint.

On appeal, Thomson concedes that she has "virtually no disagreement with the District Court's findings with respect to what happened between her and Jon Larson, or with respect to the evidence of Larson's intent." Reply Brief for Plaintiff–Appellant at 2. Instead, the focus of Thomson's appeal is on whether the district court correctly applied the *Childress* test of co-authorship, and, secondarily, whether the district court's declaration that Thomson is not a co-author nevertheless means that she retains exclusive copyright interests in any material that she contributed to the work.

## DISCUSSION

The district court properly defined the principal question in this case as: "not whether Lynn Thomson made a great contribution to the show. It is not whether she has been or ought to be compensated differently than she has been compensated. It is about whether what happened between Lynn Thomson and Jon Larson met the statutory definition as it has been construed by the higher courts of a joint work." In analyzing this issue, the district court made numerous findings of fact and then applied the *Childress* test to these facts.

■ We review the district court's finding of facts for clear error. *See* Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). And in this respect, the issue of intent is ordinarily a question of fact. *See W. Alton Jones Found. v. Chevron U.S.A., Inc.,* 97 F.3d 29, 33 (2d Cir.1996). If,

however, "a district court makes findings of fact predicated upon an incorrect legal standard such findings are not binding on an appellate court." *Weissmann v. Freeman,* 868 F.2d 1313, 1317 (2d Cir.1989). The "application of th[e] facts to draw conclusions of law," we review *de novo. See FDIC v. Providence College,* 115 F.3d 136, 140 (2d Cir. 1997).

## I. THOMSON'S CO-AUTHORSHIP CLAIM

### A. Statutory Definition of "Joint Work"

Thomson's request for a declaratory judgment establishing her co-authorship under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.,* requires us to interpret and apply the copyright ownership provisions of the Act. The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (1994). The touchstone of the statutory definition "is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit." H.R.Rep. No. 1476, 94th Cong. 120, 121 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News 5659, 5735.

■ Joint authorship entitles the co-authors to equal undivided interests in the whole work—in other words, each joint author has the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made. *See* 17 U.S.C. § 201(a); *Childress,* 945 F.2d at 508; *Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1498 (D.C.Cir.1988) ("Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby."), *aff'd. without consideration on this point,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

versions of *Rent* in a book that she planned to write.

## B. Childress Requirements

In *Childress v. Taylor*, our court interpreted this section of the Act and set forth "standards for determining when a contributor to a copyrighted work is entitled to be regarded as a joint author" where the parties have failed to sign any written agreement dealing with coauthorship. 945 F.2d at 501. While the Copyright Act states only that co-authors must intend that their contributions "be merged into ... a unitary whole," in *Childress*, Judge Newman explained why a more stringent inquiry than the statutory language would seem to suggest is required:

> [A]n inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work.

*Id.* at 507.

The facts of *Childress* highlighted this concern with "overreaching" contributors. Actress Clarice Taylor wrote a script based on the life of legendary comedienne Jackie "Moms" Mabley, but Taylor was unable to get it produced as a play. Taylor convinced playwright Alice Childress to rescue the project by writing a new script. After Childress' completion of the script, Taylor took a copy of Childress' copyrighted play and produced it at another theater without permission. *See id.* at 503. Childress sued Taylor for copyright infringement, and Taylor asserted a defense of co-authorship.[12] *See id.* at 504.

The court concluded that there was "no evidence that [Taylor's contribution] ever evolved into more than the helpful advice that might come from the cast, the directors, or the producers of any play."[13] *Id.* at 509. On that basis, the court upheld a grant of summary judgment for Childress. *See id.*

■ The potential danger of allowing anyone who makes even a minimal contribution to the writing of a work to be deemed a statutory co-author—as long as the two parties intended the contributions to merge—motivated the court to set forth a two-pronged test. A co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors. *See id.* at 507–08. The court attempted to strike a balance between "ensur[ing] that true collaborators in the creative process are accorded the perquisites of co-authorship," *id.* at 504, while at the same time, "guard[ing] against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance," *id.*

### 1. Independently Copyrightable Contributions

*Childress* held that collaboration alone is not sufficient to establish joint authorship. Rather, the contribution of each joint author must be independently copyrightable. *See* 945 F.2d at 507. It noted that this is "the position taken by the case law and endorsed by the agency administering the Copyright Act." *Id.*; *see Seshadri v. Kasraian*, 130 F.3d 798, 803 (7th Cir.1997); *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir.1990).

Without making specific findings as to any of Thomson's claims regarding lyrics or other contributions, the district court concluded that Thomson "made at least some non-*de minimis* copyrightable contribution," and

---

12. Taylor alleged joint authorship, notwithstanding the fact that, as she conceded, her major role had been researching the historical background for the script. *See Childress*, 945 F.2d at 502.

13. The court stated that Childress had "always insisted upon her status as the sole author," noting that Childress had registered the copyrights in her own name and had refused to sign an agreement proposed by Taylor that provided that the play would be jointly owned.

that Thomson's contributions to the *Rent* libretto were "certainly not zero." [14] Once having said that, the court decided the case on the second *Childress* prong—mutual intent of co-authorship. It hence did not reach the issue of the individual copyrightability of Thomson's varied alleged contributions (plot developments, thematic elements, character details, and structural components).

## 2. Intent of the Parties

### a. Mutual Intent Requirement

*Childress* mandates that the parties "entertain in their minds the concept of joint authorship." 945 F.2d at 508. This requirement of mutual intent recognizes that, since coauthors are afforded equal rights in the co-authored work, the "equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors." *Id.* at 509.[15]

The *Childress* court noted that "[a]n inquiry into how the putative joint authors regarded themselves in relation to the work has previously been part of our approach in ascertaining the existence of joint authorship." *Id.* at 508 (citing *Gilliam v. American Broad. Cos., Inc.*, 538 F.2d 14, 22 (2d Cir.1976); *Fisher v. Klein*, 16 U.S.P.Q.2d 1795, 1798 (S.D.N.Y.1990); *Maurel v. Smith*, 220 F. 195, 198 (S.D.N.Y.1915), *aff'd*, 271 F. 211 (2d Cir. 1921)). Moreover, the *Childress* rule of mutual co-authorship intent has subsequently been followed in this circuit and elsewhere. *See, e.g., Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068–69 (7th Cir.1994) (adopting *Childress*, and noting that "reliance on collaboration alone ... would be incompati-

ble with the clear statutory mandate" that there be intent to create a joint work); *Design Options, Inc. v. BellePointe, Inc.*, 940 F.Supp. 86, 90 (S.D.N.Y.1996) ("*[B]oth* parties must have intended, at the time of creation, that the work be jointly owned."); *Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154, 1157 (S.D.N.Y.1996) ("The requisite intent to create a joint work exists when the putative joint authors intend to regard themselves as joint authors [and][i]t is not enough that they intend to merge their contributions into one unitary work."); *Cabrera v. Teatro Del Sesenta, Inc.*, 914 F.Supp. 743, 764 (D,P.R.1995) (following *Childress* intent requirement).

■ *Childress* and its progeny, however, do not explicitly define the nature of the necessary intent to be co-authors.[16] The court stated that "[i]n many instances, a useful test will be whether, in the absence of contractual arrangements concerning listed authorship, each participant intended that all would be identified as co-authors." *Childress*, 945 F.2d at 508. But it is also clear that the intention standard is not strictly subjective. In other words, co-authorship intent does not turn solely on the parties' own words or professed state of mind. *See id.* ("[J]oint authorship can exist without any explicit discussion of this topic by the parties."). Rather, the *Childress* court suggested a more nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts. *See id.* at 508–09.[17] In this

---

14. Judge Kaplan stated that "there are lines in *Rent* that originated verbatim with Ms. Thomson. I don't think they amount to 9 percent, and certainly not zero. There is probably enough there that it is not *de minimis*."

15. The court added that "[t]he sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright." *Childress*, 945 F.2d at 509 (citing 17 U.S.C. § 201(d)).

16. The court in fact suggests that the test of co-authorship intent will vary depending on the

specific factual circumstances. *See* 945 F.2d at 508 (stating that the issue of co-authorship intent "requires less exacting consideration in the context of traditional forms of collaboration, such as between the creators of the words and music of a song"); *see, e.g., Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266 (2d Cir. 1944), *modified by*, 140 F.2d 268 (2d Cir.1944) (finding that a lyricist and composer were co-authors where the lyricist wrote the words for a song, intending that someone else would eventually write the music).

17. Thomson relies on several cases in which collaborators found to be statutory joint authors had no "subjective" idea that they would be deemed co-authors entitled to equal rights in the work.

regard, the court stated that "[t]hough joint authorship does not require an understanding by the co-authors of the legal consequences of their relationship, obviously some distinguishing characteristic of the relationship must be understood for it to be the subject of their intent." *Id.* at 508.[18]

Finally, the *Childress* court emphasized that the requirement of intent is particularly important where "one person ... is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another ... are joint authors." *Id.* "Care must be taken ... to guard against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance." *Id.* at 504; *see also Erickson,* 13 F.3d at 1069 ("Those seeking copyrights would not seek further refinement that colleagues may offer if they risked losing their sole authorship.").

■ Thomson intimates that *Childress'* stringent mutual intent standard is properly limited, by its facts, to cases involving claim-

ants who have made "minimal contribution[s] to the writing of a work." Brief for Appellant at 30. And she asserts that her purported *major* contribution of copyrightable expression to *Rent,* by itself, is evidence of Larson's intent that she be a co-author. Indeed, Thomson goes further and claims that this proof is enough to give her relationship with Larson the "distinguishing characteristics" needed to establish co-authorship. But *Childress* makes clear that the contribution even of significant language to a work does not automatically suffice to confer co-author status on the contributor. Under *Childress,* a specific finding of mutual intent remains necessary.[19] *See* 945 F.2d at 508. We therefore turn to an examination of the factual indicia of ownership and authorship relevant to this inquiry, as they are defined in prior cases.

### b. Evidence of Larson's Intent [20]

#### i. Decisionmaking Authority

■ An important indicator of authorship is a contributor's decisionmaking authority

---

See, e.g., *Reid,* 490 U.S. at 753, 109 S.Ct. 2166 (suggesting, in dicta, that two self-alleged sole authors might be held to be joint authors if they "prepared the work 'with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole' "); *Easter Seal Soc. for Crippled Children & Adults, Inc. v. Playboy Enters.,* 815 F.2d 323, 337 (5th Cir.1987) ("Although the parties have refused to acknowledge it ... it seems clear to us that [their contributions] were interdependent joint works of authorship."); *Strauss v. Hearst Corp.,* 8 U.S.P.Q.2d 1832, 1837 & n. 5, 1988 WL 18932 (S.D.N.Y. 1988) (finding co-authorship despite one party's denial of co-authorship intent). All these cases, though, relied on objective indices of co-authorship intent. And in the instant case, Thomson has not shown such objective indicia, *see infra* subsection I.B.2(b).

**18.** Thomson argues that the district court applied an incorrect legal standard for coauthorship that turned on whether Larson intended Thomson to have three "legal rights," namely the "right to share in the proceeds," the "right to control the work," and the "right to be recognized as the author." Judge Kaplan, however, noted (echoing the passage in *Childress*) that the parties "don't have to understand with precision exactly what [joint authorship] means in terms of legal consequences." In the context of Judge Kaplan's thorough inquiry into the evidence of both Larson's subjective and objective intent, his comments on the "legal rights" appear to be part of his consideration of whether Larson understood

"some distinguishing characteristic of the relationship."

**19.** Thomson asserts that the instant case is "the first case in which a contributor of non-de minim[i]s copyrightable material has co-created a joint work within the statutory definition, yet has been denied the rights of joint authorship." Brief for Appellant at 16. The Larson Heirs counter this contention by citing *Clogston v. American Academy of Orthopaedic Surgeons,* 930 F.Supp. 1156 (W.D.Tex.1996). In *Clogston,* a district court granted summary judgment in favor of the defendant sole author of a medical textbook and rejected the plaintiff photographer's claim that he was a co-author on the basis of having contributed more than ninety percent of the photographs. We do not go as far as the *Clogston* court, which stated that "the importance of [a claimant's] contribution" to a work "is simply not a relevant inquiry" under *Childress. Id.* at 1162. And we, therefore, do not embrace *Clogston's* holding that the "extent of ... contribution alone is inadequate to create a genuine issue of material fact." *Id.* We believe, however, that in *Childress,* the limited contribution made by Taylor was not the only, or even the dominant, factor in the determination that co-authorship intent was missing.

**20.** Under *Childress,* each putative co-author must intend to be a co-author in order to give rise to a co-author relationship. *See* 945 F.2d at 508.

over what changes are made and what is included in a work. *See, e.g., Erickson,* 13 F.3d at 1071–72 (an actor's suggestion of text does not support a claim of co-authorship where the sole author determined whether and where such contributions were included in the work); *see also Maurel,* 271 F. at 214–15 (claimant had a contractual right to control the contents of the opera).

The district court determined that Larson "retained and intended to retain at all times sole decision-making authority as to what went into [*Rent* ]." In support of its conclusion, the court relied upon Thomson's statement that she was "flattered that [Larson] was asking [her] to contribute actual language to the text" and found that this statement demonstrated that even Thomson understood "that the question whether any contribution she might make would go into the script was within Mr. Larson's sole and complete discretion." [21] Moreover, as the court recognized, the November agreement between Larson and the NYTW expressly stated that Larson had final approval over all changes to *Rent* and that all such changes would become Larson's property.[22]

*ii. Billing*

█ In discerning how parties viewed themselves in relation to a work, *Childress*

also deemed the way in which the parties bill or credit themselves to be significant. *See* 945 F.2d at 508 ("Though 'billing' or 'credit' is not decisive in all cases … consideration of the topic helpfully serves to focus the fact-finder's attention on how the parties implicitly regarded their undertaking."). As the district court noted, "billing or credit is … a window on the mind of the party who is responsible for giving the billing or the credit." And a writer's attribution of the work to herself alone is "persuasive proof … that she intended this particular piece to represent her own individual authorship" and is "*prima facie* proof that [the] work was not intended to be joint." *Weissmann,* 868 F.2d at 1320.

Thomson claims that Larson's decision to credit her as "dramaturg" on the final page of *Rent* scripts reflected some co-authorship intent.[23] Thomson concedes that she never sought equal billing with Larson, but argues that she did not need to do so in order to be deemed a statutory co-author.

The district court found, instead, that the billing was unequivocal: Every script brought to [the court's] attention says "*Rent,* by Jonathan Larson." [24] In addition, Larson "described himself in the biography he submitted for the playbill in January 1996, nine

The Larson Heirs suggest that "Thomson's lack of co-authorship intent provides a second and independent basis for affirming the decision below." Brief for Defendants–Appellees at 49. The district court, having found that "Mr. Larson never regarded himself as a joint author with Ms. Thomson," stated that it had no reason to rule on this alternative basis for dismissal. (It noted that "arguments could be made both ways.") Because we affirm the district court's conclusion that Larson lacked co-authorship intent, we too will refrain from addressing Ms. Thomson's intent, except as it may seem to bear on Larson's.

21. There was also documentary evidence before the district court that confirmed the advisory nature of Thomson's role. Thus, a set of notes Thomson wrote to Larson began, "Please know that everything is intended as a question but might sound differently in the shorthand of the writing." And other notes, addressed to Nicola and Grief, read: "Usual disclaimer; the following is meant to generate discussion. Even when I offer 'solutions' what I mean is only to communicate a response by example…."

22. In this respect, the district court also credited a telephone interview Larson gave in October

1995 to a high school student, in which Larson "said, in substance, that he wrote everything in *Rent* and distinguished writers in the theater from writers in the other media by saying that in the theater the writer is the king." ("In theater, as opposed to film and television, dramatists retain copyright to their work, [and] are independent contractors…." Brief for Amicus Curiae The Dramatists Guild, Inc. at 15 n.3.) The district court found this statement significant because it "evidences Mr. Larson's view that *Rent* in all respects was his, he was the king."

23. Thomson argues that this "unprecedented" credit on the copyright page of the script distinguishes her role from that of Larson's many other collaborators, including Artistic Director Nicola, Director Greif, the producers, and a previous dramaturg, none of whom was given similar credit.

24. Similarly, both the Off–Broadway and the Broadway playbills identify Rent as being "by Jonathan Larson," while Thomson is listed as "Dramaturg."

days before he died, as the author/composer, and listed Ms. Thomson on the same document as dramaturg." And while, as Ms. Thomson argues, it may indeed have been highly unusual for an author/composer to credit his dramaturg with a byline, we fail to see how Larson's decision to style her as "dramaturg" on the final page in *Rent* scripts reflects a co-authorship intent on the part of Larson. The district court properly concluded that "the manner in which [Larson] listed credits on the scripts strongly supports the view that he regarded himself as the sole author."

### *iii. Written Agreements with Third Parties*

Just as the parties' written agreements with each other can constitute evidence of whether the parties considered themselves to be co-authors, *see Gilliam v. American Broad. Cos.*, 538 F.2d 14, 22 (2d Cir.1976) (written screenwriters' agreement between the parties indicate that they did not consider themselves joint authors of a single work); *Erickson*, 13 F.3d at 1072 (licensing agreement evidences lack of co-authorship intent); *see also Maurel v. Smith*, 271 F. at 214–15 (contracts evidence co-authorship relationship), so the parties' agreements with outsiders also can provide insight into co-authorship intent, albeit to a somewhat more attenuated degree.

The district court found that Larson "listed himself or treated himself as the author in the November 1995 revisions contract that he entered into with the NYTW, which in turn incorporated the earlier draft author's agreement that had not been signed." That agreement identifies Larson as Rent's "Author" and does not mention Thomson. It also incorporates the terms of a September 1995 draft agreement (termed "Author's Agree-

ment") that states that Larson "shall receive billing as sole author."[25] The district court commented, moreover, that "[t]he fact that [Larson] felt free to enter into the November 1995 contract on his own, without the consent of and without any reference to Ms. Thomson quite apart from whatever the terms of the agreements are, indicates that his intention was to be the sole author."[26]

### *iv. Additional Evidence*

Beside relying on evidence that Larson retained decisionmaking authority over the final work, that he was billed as sole author, and that he entered into written agreements with third parties as sole author, the district court found much other evidence that indicated a lack of intent on Larson's part to make Thomson a co-author.

Thus, at various times during the development of *Rent* (once shortly before Thomson was hired as dramaturg in the summer of 1995), Artistic Director Nicola suggested to Larson that he work with a bookwriter to assist him in the refinement of the script. Larson, however, "absolutely, vehemently and totally" rejected the idea of a bookwriter and was steadfast in his determination to make *Rent* "entirely his own project." The district court found that Larson's "rejection of a book writer ... speaks to Mr. Larson's intent[ ] ... [and] is part of a broader pattern that persuades me that Mr. Larson never intended the joint authorship relationship."

Moreover, the evidence before the district court established that Larson not only understood the concept of co-authorship, but that he had used the term "co-author" on two separate copyright applications for different versions of a screenplay he wrote in 1991 and 1992. Larson had also used the term "co-

**25.** Another provision of the "Author's Agreement" explicitly reserved to Larson all rights in *Rent* not expressly granted to the NYTW. Such a reservation of rights clause is consistent with Larson's intent to be the work's sole author. *See Gilliam*, 538 F.2d at 22 (finding that a reservation of rights provision "suggest[s] that the parties did not consider themselves joint authors of a single work").

**26.** In addition to Larson's agreements with the NYTW (which were relied upon directly by the

district court), on November 30, 1995, Larson agreed to an option deal with the commercial producers defining the royalty payments and other entitlements to flow to him as the "Author" of *Rent*. Like the November NYTW agreement, this option deal made no reference whatsoever to Thomson. (Indeed, Thomson engaged in no contractual negotiations with the NYTW or with the Broadway producers with respect to authorial rights.)

author" in the November 1993 written agreement with Billy Aronson, which provided that Aronson would "not . . . be considered an active collaborator or co-author of RENT." On the basis of this evidence, the district court found that, while Larson "understood that the phrase 'co-author' was one freighted with legal significance[ ] . . . there is absolutely no evidence whatever . . . that [Larson] ever regarded himself as a co-author with Ms. Thomson of *Rent*."

Finally, the court relies on "an explicit discussion on the topic of co-authorship" that Thomson claims she and Larson had. Brief for Appellant at 9. According to Thomson's written trial testimony, the conversation was as follows:

> I told him I was flattered that he was asking me to contribute actual language to the text. He responded by saying "Of course I want you to do that!" . . . He then told me the following: "I'll always acknowledge your contribution," and "I would never say that I wrote what you did."

The district court found that the alleged conversation was "entirely consistent with Mr. Larson's view that he was the sole author and that Ms. Thomson . . . was the dramaturg, which he conceived to be a different role."

### c. Conclusion

Based on all of the evidence, the district court concluded that "Mr. Larson never regarded himself as a joint author with Ms. Thomson." We believe that the district court correctly applied the *Childress* standards to the evidence before it and hold that its finding that Larson never intended co-authorship was not clearly erroneous.

27. The work-for-hire provisions are an exception to the rule that copyrights belong in the first instance only to creators. *See* 17 U.S.C. § 201(b). And in the case of specially ordered or commissioned works, the parties must "expressly agree[ ] in a written instrument" in order for the work to be considered a work for hire. *See id.*

28. Employees are automatically covered by the work-for-hire provisions. *See* 17 U.S.C. § 101.

### II. THOMSON'S ALLEGED COPYRIGHT INTERESTS

The Copyright Act declares that "[c]opyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. § 201(a). Each author's rights in a joint work are non-exclusive, *see id.*, whereas a sole author retains exclusive rights in his or her own work, *see id.* § 106.[27]

In this respect, the instant case presents somewhat of a conundrum. "[M]ost dramaturgs work on play scripts as employees of the producing theater company, and even absent an employment agreement waiving ownership of copyrights, in the ordinary course they would not have any copyright interests, under the work-for-hire doctrine."[28] Brief for *Amici Curiae* The National Writers Union and Literary Managers and Dramaturgs of the Americas, Inc. at 4–5. Thomson, however, independently contracted with the NYTW. (It is unclear whether the NYTW was Larson's agent, but this, seemingly, is of no significance.) Accordingly, there was no written agreement between Thomson and Larson.[29] It is also undisputed that Larson never asked Thomson to state that her contribution would be work for hire, or that she would own no copyrights or transfer them to anyone.

Thomson argues that, if she is not deemed to be a joint author of *Rent*, then "she must have all of the rights of a sole author with respect to her own contribution." Brief for Plaintiff-Appellant at 17. On appeal, she asserts for the first time that the only alternative to finding co-authorship is to split a co-created work into its components—*i.e.*, she must be entitled to withdraw her purported contributions. The National Writers Union, a trade union of freelance writers, and Literary Managers and Dramaturgs of the Amer-

29. We agree that "[o]ne of the salutary effects of [Thomson's] widely reported assertion of her rights has been in opening up discussions among playwrights and dramaturgs to clarify their respective understandings, and in understanding the advisability of reaching agreements and committing such agreements to writing." Brief for *Amici Curiae* The National Writers Union and Literary Managers and Dramaturgs of the Americas, Inc. at 19.

icas, Inc., a professional association, as *amici curiae* in support of Thomson, further suggest that Thomson has grounds to file an infringement suit relating to the same material on which her co-authorship claim is premised. Brief for *Amici Curiae* The National Writers Union and Literary Managers and Dramaturgs of the Americas, Inc. at 13 n.1.

The Larson Heirs contend that "[u]nder *Childress*, copyrightable contributions by an editor or other person retained to assist an author belong to the author, absent mutual co-authorship intent." Brief for Defendants–Appellees at 46. They conclude that "[b]ecause she is not a joint author, Thomson has no rights." *Id.* at 47. In the alternative, the Larson Heirs claim that "even if, despite *Childress*, the sole author is not the copyright owner of the materials contributed by others, the suggestions proffered by Thomson were impliedly or expressly licensed to Larson for use in *Rent.*" *Id.* In a similar vein, The Dramatists Guild, Inc., a professional association of playwrights, librettists, composers, and lyricists, posits that "[g]iven the collaborative nature of theater, any 'contribution' of copyrightable material should be understood as conveying with it to the playwright a non-exclusive license to use the collaborator's material in the work, absent some other arrangement in writing." Brief for *Amicus Curiae* The Dramatists Guild, Inc. at 30.

■ Our circuit has not decided whether a person who makes a non-*de minimis* copyrightable contribution but cannot meet the mutual intent requirement of co-authorship, retains, in the absence of a work-for-hire agreement or of any explicit contractual assignment of the copyright, any rights and interests in his or her own contribution.[30] This issue, however, was not presented to the district court by the parties. The only ground for relief asserted by Thomson was her purported co-authorship of *Rent.* Thomson's assertion that, if she is not deemed a co-author, she has exclusive rights with respect to the material that she contributed to *Rent,* is raised for the first time on appeal:

> [I]f it were to be affirmed that Rent is not a statutory joint work, [Thomson] then would be awarded rights which she never imagined, much less sought, and which she would be loathe to enforce. Under Section 106, she would have the right to enjoin any use of her contributions in any stage production, book, cast album, or motion picture.

Brief for Appellant at 44. In other words, she contends that "other than an argument of joint authorship between Thomson and Larson, there would be no defense to an infringement suit brought by Thomson." Brief for *Amici Curiae* The National Writers Union and Literary Managers and Dramaturgs of the Americas, Inc. at 13 n.1.

But Thomson has not brought such an infringement suit. Nor has she yet attempted to restrain any use of her allegedly copyrighted material. Accordingly, the district court had no occasion to rule on: (1) whether Thomson, if not deemed a co-author, nevertheless had copyright interests in the material that she contributed to *Rent* or, alternatively, (2) whether Thomson granted Larson a license to use the material that she purportedly contributed to *Rent,* and if so on what terms. Because these issues were not raised below and therefore are not properly before us, we express no opinion on them.

## CONCLUSION

The district court found that Jonathan Larson lacked the requisite intent to accept

---

**30.** In *Childress,* our court stated:

> Th[e] equal sharing of rights [mandated by joint authorship] should be reserved for relationships in which all participants fully intend to be joint authors. The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright, *see* 17 U.S.C. § 201(d).

945 F.2d at 509. *Childress* did not, however, address either whose burden it was to form such a contract or whether, in the absence of a contract, a contributor (who is not a joint author) of copyrightable expression retains rights in the contributed material. (In fact, in *Childress,* the court did not even rule on the first prong of the test—whether Taylor's contributions were independently copyrightable—since it concluded that Childress did not intend a co-authorship relationship. *See id.* at 509).

Lynn Thomson as a co-author of *Rent*. We hold that the district court properly applied the *Childress v. Taylor* test of co-authorship and that its factual finding with respect to Larson's intent is not clearly erroneous. We therefore affirm the judgment of the district court.