In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-2350, 07-2762 & 08-1606

CHERYL JANKY,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

LAKE COUNTY CONVENTION AND
VISITORS BUREAU,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 C 217—**Andrew P. Rodovich**, *Magistrate Judge.*[1]

ARGUED OCTOBER 28, 2008—DECIDED AUGUST 3, 2009

Before BAUER, RIPPLE, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*.   This over-litigated case, involving
a song by a doo-wop group, comes to us with 18 district

---

[1]  Most of the heavy lifting in this case was done by Magistrate
Judge Paul R. Cherry. Judge Cherry recused himself after the
case was tried to a jury, and Magistrate Judge Andrew P.
Rodovich picked it up at that point.

court orders and memorandum opinions spread over a combined 239 pages. The district court's 46-page docket contains a staggering 371 entries. And the briefs of the parties on appeal are a bit unfocused to say the least. But although it's a tough job, someone has to do it, so with shoulder to the wheel, we forge on.

Lake County, Indiana, is the home of Gary, a gritty industrial town southeast of Chicago. But there's much more to Lake County than Gary—including miles of pristine beachfront along the Indiana Dunes National Lakeshore—and the Lake County Convention and Visitors Bureau (the Bureau) wants you to know that. To get the word out, the Bureau commissioned a tune singing the county's praises, the distribution of which led to this lawsuit for copyright infringement. Cheryl Janky says she composed the song and never gave the Bureau permission to use it. The Bureau maintains that Janky was only a co-author and that it had the authority to use the song by licensing it from the other song-writer, Henry Farag. The district court entered partial summary judgment in favor of Janky—deciding that she was the sole author—and a jury awarded her $100,000 in damages. The Bureau now appeals, contending that summary judgment was improper given the evidence of co-authorship. In the alternative, the Bureau submits that the district court erred when it denied a motion for remittitur or new trial in light of Janky's failure to mitigate damages. Janky cross-appeals from an order concerning the imposition of sanctions against her counsel under Rule 11.

Before we get to the underlying facts, we need to assess our jurisdiction. *See Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1097 (7th Cir. 2008) ("A court of appeals has an obligation to examine its jurisdiction sua sponte, even if the parties fail to raise a jurisdictional issue.") (quoting *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 660 (7th Cir. 1998)). The Bureau has made this task more complicated than usual because its brief is defective. At oral argument the Bureau clarified that it seeks, first and foremost, review of the summary judgment decision. However, that is not at all apparent from the Bureau's brief, which neither references the lower court's summary judgment opinion within the jurisdictional statement nor includes that opinion within its short appendix, all in violation of the applicable rules. *See* Fed. R. App. P. 28(a)(4), 30(a); 7th Cir. R. 28(a)(2), 30(a). Janky's brief isn't any better. Although we take these rules seriously, we are nonetheless willing to forgive the violation in this case because we do in fact have jurisdiction. To be sure, the Bureau was not permitted to appeal as of right following the grant of partial summary judgment. *See Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976) ("[P]artial summary judgment[s] limited to the issue of [a] petitioner's liability . . . are by their terms interlocutory, see Fed. Rule Civ. Proc. 56(c), and where assessment of damages . . . remains to be resolved have never been considered to be 'final' within the meaning of 28 U.S.C. § 1291."). So we do not fault the Bureau for waiting to appeal until the denial of its motion for new trial or remittitur. And though the Bureau did a poor job of explaining exactly what it seeks, we are satisfied that

the denial of the motion for new trial or remittitur impli-
cates all prior orders, including the decision on sum-
mary judgment. With that sorted out, then, we can turn
to the facts.

Janky and Farag were members of "Stormy Weather," an
Indiana-based doo-wop group.[2] Farag heard through the
grape vine that the Bureau was looking for a song to
represent Lake County, and he suggested that the band
might want to give it a shot. Janky took the initiative.
After Farag made the announcement, she got to work
writing the music and lyrics for a tune she called "Wonders

---

[2] Doo-wop is characterized by vocal harmonies. It became
popular in the 1950s and 1960s with the arrival of groups like
**The Five Satins** ("In the Still of the Night"), **The Platters** ("My
Prayer"), **The Skyliners** ("Since I Don't Have You"), **The
Turbans** ("When You Dance"), **The Penguins** ("Earth Angel"),
**The Crystals** ("Da Doo Ron Ron"), **Frankie Lymon and the
Teenagers** ("Why Do Fools Fall in Love?"), and the incompara-
ble **Drifters** ("There Goes My Baby," "This Magic Moment,"
"Save the Last Dance for Me," "Under the Boardwalk," and "Up
on the Roof"). According to Stormy Weather's Web site, the
group is "the chief proponent of the nation's revitalized a
cappella doo-wop sound." Stormy Weather has produced 14
albums, including "Street Carols" (a "holiday classic," says its
Web site) and "Doo-Wop & Lollipops." The group has also
performed with the likes of **Smokey Robinson, Franki Valli,**
and **Dion Francis DiMucci** (who, as **Dion**, made it big with hits
like "Runaround Sue" and "The Wanderer"). The group
reports that it has traveled around the world keeping "the a
cappella sounds of the street corner alive, well, and kickin'."
www.stormy-weather.com (last visited Nov. 26, 2008).

of Indiana" (a.k.a. "Indiana"). When it was complete, Janky obtained a copyright for the song (in May 1999), listing herself as the sole author. Janky then showed the song to Farag. Although Farag thought it had potential, he recommended revising the lyrics to better suit the Bureau's vision. Pursuant to a conversation with the Bureau's chief executive officer, Farag suggested that the song needed to focus more on Lake County in particular, as opposed to Indiana in general, and include references to the area as "Chicago's neighboring south shore" and to its ethnic diversity. Janky testified that Farag's recommendations, which she adopted, accounted for 10 percent of the lyrical content. With the song revamped, Janky filed a new copyright registration form in December 1999, this time listing Farag as a co-author who provided "additional lyrics" and styling the effort a "joint work." Similarly, she filed a document with the American Society of Composers, Authors and Publishers (ASCAP) stating that Farag held a 10 percent "ownership share." She now says that was all a mistake.

According to Janky, Farag was not a co-author and she did not intend to give him credit as such. Rather, she testified that she placed Farag's name on the registration form "as an indication of [her] gratitude . . . and to demonstrate that [she] appreciated every little bit of support." She said she now realizes that the proper way to acknowledge a "de minimis" contribution is by making a notation on the album cover.

Farag sees it differently. He says the lyrical changes were "significant," and revisions were also made to the melody.

This difference of opinion did not manifest itself immediately, however. For the time being, there was music to be made. Janky, Farag, and the rest of Stormy Weather recorded a demo of the song at Thunderclap Studios in Hammond, Indiana. They followed that up with a music video and presented their work to the Bureau for review. The Bureau was satisfied—it would be a great marketing tool. And Stormy Weather was a generous partner. Rather than seeking to extract a profit from the venture, Stormy Weather agreed to allow the Bureau to use the video and song in return for the costs of production. Beyond that, the group decided the publicity generated from the Bureau's use of the material would be payment enough. Farag issued a nonexclusive license to the Bureau to that effect.

The Bureau's first use of the song came on December 1, 1999. The Bureau opened a new visitor's center that day, and it commemorated the occasion not only by playing the music video, but also with a live performance. When Stormy Weather completed production of the album on which the song ultimately appeared—"Doo-It Doo-Wop," published by Street Gold Records—in June of 2000, the Bureau purchased 1,500 copies to resell at the visitor's center.[3] Beginning around the same time, the Bureau treated callers placed on hold to the sounds of Stormy Weather, and it frequently played the song at

---

[3] When it released the album, Stormy Weather renamed the tune "Lake County, Indiana." There is no dispute, however, that this was the same song registered in December 1999.

the visitor's center and used it in promotional ads. So passed the next three years.

On July 15, 2003, Janky filed yet another copyright registration form, ostensibly to correct the "mistake" she had made in the previous form. Janky omitted Farag's name, listing herself as the sole author of the music, lyrics, and "arrangement performance." And at some point in time she notified the Bureau that she was the exclusive owner. However, the Bureau did not stop using the tune until she filed this lawsuit against it in October 2003.

Janky alleged in her complaint (just like in her latest registration form) that she was the sole author of the song and had a valid copyright in the tune to the exclusion of Farag. As a result, so the theory went, Farag's license to the Bureau was without effect and the latter's use of the song illegal. Although Janky originally filed her complaint in the Eastern District of Michigan and named Farag and Street Gold as additional defendants, the case was transferred to the Northern District of Indiana early, and the matter was stayed against Farag and Street Gold pursuant to bankruptcy proceedings. The parties thereafter consented to have a magistrate judge handle the case. After conducting discovery, cross-motions for summary judgment were filed. In March of 2006, the magistrate judge issued his summary judgment decision in favor of Janky. A jury trial, on damages, was conducted a year later, in March of 2007.

The main issue—both in the district court and here on appeal—is whether Janky holds the copyright to the song by herself or whether she shares it with Farag as a co-

author. In general, individuals are co-authors of a work only where they (1) intend to create a joint work; and (2) contribute independently copyrightable material. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994). Applying this standard, the magistrate judge found in favor of Janky on both scores. First, he found that a jury would have no choice but to conclude that Farag and Janky didn't intend to be co-authors at the time of creation. Second, he found that Farag's contributions were nothing more than "minimal revisions" of a song Janky already composed.

We disagree with that analysis, which we review *de novo*. *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 677 (7th Cir. 2008). But before we get too much further, a bit more on the background law.

A plaintiff alleging copyright infringement must establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. V. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Janky's satisfaction of the second element is in little dispute. An individual "copies" another's work for purposes of copyright law if he plays it publicly or distributes copies without the copyright owner's authorization. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 157 (1975); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996) ("Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission[.]"). The Bureau concedes that it played and distributed the song that Janky claims as her sole

creation. And no one questions that the song enjoys copyright protection. The question is, was Janky the only author? If not—if Farag was a co-author—then Janky does not own the copyright exclusively, and the Bureau had a right to use the song with Farag's permission.

On, then, to the legal framework of joint authorship. Under 17 U.S.C. § 201(a), "[t]he authors of a joint work are co-owners of copyright in the work." In other words, "the joint authors hold undivided interests in [the] work, despite any differences in each author's contribution." *Erickson*, 13 F.3d at 1068. The benefits of co-authorship are therefore significant: each author may use or license the joint work. *Id.*

But when does a song qualify as a "joint work"? Section 101 of the Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In *Erickson*, we determined that this language requires (1) intent to create a joint work; and (2) contribution of independently copyrightable material.[4] *Erickson*, 13 F.3d

---

[4] Later, in *Gaiman v. McFarlane*, 360 F.3d 644, 658-59 (7th Cir. 2004), we identified an exception to the requirement of independent copyrightability. However, that exception obtains only when none of the constituent parts could pass the test of copyrightability due to "the nature of the particular creative process," e.g., the creation of a comic book by a writer, a penciler, an inker, and a colorist. *Id.* at 659. The exception is not

(continued...)

at 1068, 1071. With respect to the first element, we explained that the intent prong does not have to do with the collaborators' intent to recognize each other as co-authors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not on the legal consequences of that collaboration. *See id.* At 1068-69. We also noted that " 'billing' or 'credit' may be evidence of intent to create a joint work." *Id.* at 1072 (internal quotation marks omitted). As to the second element, we rejected Professor Nimmer's "de minimis" test, which posits that a joint work exists whenever there is "more than a de minimis contribution by each author." *Id.* at 1070. The standard we embraced requires more than that: a contribution that is independently copyrightable. Measured against this standard, we held that the putative joint author of a play was not a joint author where his contributions were limited to "[i]deas, refinements, and suggestions." *Id.* at 1072. "[S]tanding alone," we said, these contributions were "not the subject of copyright." *Id.*

As in *Erickson*, the first question for us is whether Farag and Janky intended to create a joint work. Janky certainly denies that now, but that is irrelevant. The issue is whether Janky and Farag "intended to be joint authors at the time the work was created." *Id.* at 1070. We think they did, so much so that Farag was entitled to sum-

---

[4] (...continued)
applicable in this case because Janky's work was copyrightable before Farag got on board.

mary judgment on this point. Unlike *Erickson*, where an individual made minor *suggestions* but the final decision belonged "entirely" to the principal playwright, *id.* at 1072, the song here was the product of Janky *and* Farag. Farag wielded considerable control over what the song finally looked like; one could even say he demanded the changes. More important, however, is the evidence of intent supplied by Janky herself. We observed in *Erickson* that crediting another person as a co-author is strong evidence of intent to create a joint work. *See id.* at 1072; *see also Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991) ("Though 'billing' or 'credit' is not decisive in all cases and joint authorship can exist without any explicit discussion of this topic by the parties, consideration of the topic helpfully serves to focus the factfinder's attention on how the parties implicitly regarded their undertaking.") (footnote omitted). In this case, we have such an acknowledgment—Janky named Farag a co-author and deemed the song a "joint work." Janky's post hoc rationalization—that she only intended to express her gratitude—is simply at odds with the significant contributions made by Farag and Janky's identification of Farag as a co-author in the copyright registration form. Just as litigants "cannot create sham issues of fact with affidavits that contradict their prior depositions," *Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) (internal quotation marks omitted), Janky's affidavit cutting the other way is entitled to little weight. A reasonable jury could only conclude that Janky and Farag intended to create a joint work.

As to the second element—independent copyrightability—we think the situation here differs considerably

from *Erickson*. Farag's contributions went beyond general "[i]deas, refinements, and suggestions." They were concrete expressions and thus pass the test of copyrightability where mere ideas fail. *Gaiman*, 360 F.3d at 658. In addition, while Farag's changes may have accounted for only 10 percent of the lyrics, they were significant. They were important not only to the final sound, but also to its commercial viability. Before Farag became involved, the song celebrated the charm of Indiana as a state; Farag shifted the focus to Lake County. Without Farag's input, it is unlikely that the Bureau would have embraced the song the way it did. And though we think any reasonable jury would agree with us on this point, that doesn't actually matter. Under our precedent, "copyrightability is always an issue of law." *Gaiman*, 360 F.3d at 648 (citing *Publications Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996)).

Despite this conclusion, however, we admit that this is a close case. Farag contributed ideas and gave expression to those ideas, but had he done much less, his work would not garner the protection of copyright. We have observed in the past that published creations are almost always collaborative efforts to some degree—peers make suggestions, editors tweak words, and so forth. *See id.* at 658. Were we to deem every person who had a hand in the process a co-author, "copyright would explode." *Id.* On the other hand, the very purpose of copyright law is to promote the progress of the arts and sciences, U.S. CONST. art. I, § 8, cl. 8; *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994), a purpose that is defeated if important contributions are

denied copyright protection. Placing a contribution in one hopper or the other is not always an easy task, and the judge here made a commendable effort. In the end, though, this doo-wop ditty is a joint work.[5]

That leaves only one loose end—Janky's cross-appeal.[6] After the district court handed down its summary judgment decision, it levied $2,500 in sanctions against Janky's attorney, Gregory Reed, under Rule 11 of the Federal Rules of Civil Procedure. The court found that Reed filed a motion for injunctive relief without any legal or factual support. (Reed wanted the Bureau to stop selling the song, but it hadn't done so for several years.) When the jury returned a verdict for Janky in the amount of $100,000, the parties jointly sought to reduce the judgment by the amount owed in Rule 11 sanctions. It is only logical, however, that Reed was the driving force behind this request—the cost to the Bureau would be the same either way, but paying the

---

[5] Janky may still have a cause of action against Farag for an accounting of profits, *see Gaiman*, 360 F.3d at 652; *Erickson*, 13 F.3d at 1068, but that possibility has no bearing on the appeal before us.

[6] The Bureau also appealed from the district court's ruling on another motion for sanctions (Court of Appeals Case No. 08-1606). However, the Bureau never mentioned that issue in its principal or reply brief—not so much as an argument header! Perhaps the Bureau was overwhelmed by the sheer amount of paper filed in this case. Whatever the reason, this issue is waived for lack of development. *See Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007).

Rule 11 sanctions out of Janky's judgment would save Reed $2,500. In other words, Reed sought to use funds from his client's victory to pay for a penalty he had incurred all by himself. The district court was not impressed; not only would this proposal shift the burden to an innocent party (Janky), it would violate the terms of Rule 11(c)(5)(A), which provides that monetary sanctions shall not be imposed against a represented party for frivolous legal contentions. Reed apparently does not dispute the propriety of sanctions in the first instance, but he insists that the court abused its discretion in denying his request for a setoff.[7] We highly doubt that. But we need not decide the issue because it is mooted by our conclusion that the Bureau is entitled to summary judgment—there is now no verdict from which sanctions can be deducted.

For these reasons, the judgment is REVERSED and the case REMANDED so that summary judgment can be entered in favor of the Bureau, and for such further proceedings that may be necessary.

---

[7] That's certainly how Reed framed the issue on the notice of appeal and jurisdictional statement. However, to the extent Reed thinks sanctions were inappropriate to begin with, we have considered that issue and find no error.

RIPPLE, *Circuit Judge*, dissenting. I agree with the majority that the district court improperly granted Ms. Janky summary judgment on the issue of copyright ownership. However, I cannot agree with the majority's conclusion that the Bureau is entitled to summary judgment under our precedent in *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994). I therefore must respectfully dissent.

In reviewing the district court's grant of summary judgment, "we consider only those matters that were before the district court when it entered the judgment." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1024 (7th Cir. 2003) (citation and quotation marks omitted). To establish that Ms. Janky and Farag intended to create a joint work under *Erickson*, the Bureau needed to show (1) that Farag and Ms. Janky "intended to be joint authors at the time the work was created" and (2) that Farag's contributions to the song were independently copyrightable. *See Erickson*, 13 F.3d at 1071. When the district court considered Ms. Janky's motion for summary judgment on copyright ownership, there was little evidence regarding Farag's intent to become a joint author. In its motion opposing summary judgment, the Bureau presented a certificate of registration for a joint copyright as evidence of Farag's intent. *See* R.71, Ex. 2. However, Farag stated in his counterclaim that his name was forged on the copyright application, which cast doubt on the Bureau's claim that Farag intended to create a joint authorship. *See* R.64, Ex. B-1.

Farag stated in his declaration that he was an "owner and/or co-owner" of the song, R.29, Ex. 6 at ¶ 6, and Ms.

Janky's declaration acknowledged that Farag revised her original work "by 10%," R.29, Ex. 1 at ¶ 5. Nevertheless, there was no evidence before the district court establishing that Farag intended to create a joint work, as required under *Erickson*, 13 F.3d at 1071. Moreover, Farag's notice of affirmative defenses stated that Ms. Janky did not own the copyrights at issue, R.64, Ex. B-2 at ¶ 8, a view that undermines the Bureau's claim that Farag intended to create a joint authorship with Ms. Janky.

In finding that Farag intended to be a joint author, the majority emphasizes the fact that "Farag wielded considerable control over what the song finally looked like" and that Ms. Janky credited him in the copyright application. *Ante*, at 11. The factors of decisionmaking and billing were discussed briefly in *Erickson* and at greater length in a subsequent Second Circuit opinion. *See Thomson v. Larson*, 147 F.3d 195, 202-03 (2d Cir. 1998) (citing *Erickson*, 13 F.3d at 1071-72). However, even if we take these factors into account in our analysis, the record at summary judgment does not show that Farag possessed the requisite intent to create a joint work. *See Erickson*, 13 F.3d at 1071. Consequently, the first requirement for joint authorship has not been met.

I also believe that the Bureau has failed to establish that Farag's "contributions to the [work] were independently copyrightable." *See Erickson*, 13 F.3d at 1071. As the majority observes, we know that Farag's contributions to the lyrics were his suggestion to Ms. Janky that the song focus on Lake County specifically, and the specific suggestion that the song include a reference to "Chicago's

neighboring south shore"[1] and to its ethnic diversity. These contributions do not rise above mere "[i]deas, refinements, and suggestions." *Id.* at 1072.

I do not think that the record before us allows us to affirm summary judgment for Ms. Janky or to grant summary judgment to the Bureau on the issue of copyright ownership. I would remand this case to the district court for further proceedings on the merits.

---

[1] Short phrases are generally not entitled to copyright protection. 37 C.F.R. § 202.1 (2004); *see also Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir. 1972). Consequently, Farag's addition of the phrase "Chicago's neighboring south shore" is not sufficient to establish that his contribution was independently copyrightable.