Cynthia **MAURIZIO**, Plaintiff,

v.

Olivia **GOLDSMITH**, a/k/a Justine Rendal, a/k/a Randi J. Goldfield, Defendant.

No. 96 Civ. 4332(LMM).

United States District Court, S.D. New York.

Jan. 26, 2000.

Robert C. Osterberg, Jeffrey A. Schwab, Nancy J. Mertzel, Abelman, Frayne & Schwab, New York City, for plaintiff.

Howard J. Schwartz, Cynthia Dreeman, Porzia, Bromberg & Newman, P.C., Morristown, NJ, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Cynthia Maurizio ("Maurizio") brought this action for copyright infringement, a declaration of joint authorship and an accounting in connection therewith, violation of Lanham Act Section 43(a), and various state law claims against defendant Olivia Goldsmith ("Goldsmith").[1] (Compl.¶ 3). The facts of the case involve authorship of the novel *The First Wives Club* ("FWC"), which was subsequently made into a motion picture. This Court has jurisdiction based upon the federal questions involved, *see* 28 U.S.C. §§ 1331, 1338 & 1367, and based upon diversity of citizenship, *see* 28 U.S.C. § 1332.

Goldsmith now moves for summary judgment. For the reasons set forth in this opinion, this Court grants Goldsmith's motion as to the following: (1) the joint authorship claim, (2) the copyright infringement claim so far as it alleges acts of infringement that did not occur within three years of Maurizio's filing of her complaint in this Court, and (3) claims under New York General Business Law Sections 349 and 350. Goldsmith's motion is denied as to the remainder of the claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Id.* at 250, 106 S.Ct. 2505. Once the moving party establishes a prima facie case demonstrating the absence of a genuine issue of material fact, the non-moving party has the burden of presenting "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505

---

**1.** "Olivia Goldsmith" is defendant's pen name. Defendant's actual name is Justine Rendal, and she also goes by the name Randi J. Goldberg.

(1986). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Further, when a case turns on the intent of one party, a "trial court must be cautious about granting summary judgment." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994).

## FACTUAL AND PROCEDURAL BACKGROUND

As noted above, at this stage Maurizio's evidence is to be believed and all justifiable inferences are to be drawn in her favor. Thus, the following history accepts Maurizio's allegations as true where they are properly supported by evidence.

### A. Goldsmith and Maurizio Agree to Work Together

Goldsmith and Maurizio first met during the summer of 1989 at a social event hosted by RKO Pavilion ("Pavilion"), a movie production company. At the time, both were aspiring novelists. By the end of that year, they had become friendly.

In or around June 1989, Goldsmith started writing FWC. Initially, Goldsmith intended FWC as a movie script, but by November 1989, however, Goldsmith decided to write the story as a novel. By January 1990, Goldsmith had completed the first hundred pages of the manuscript. By March 1990, Al Zuckerman ("Zuckerman"), an agent with Writers' House, Inc., had agreed to represent Goldsmith based on his evaluation of a 20–30 page synopsis of FWC constructed by Goldsmith. Zuckerman advised Goldsmith that, before he could sell the novel, he would need either a complete manuscript of FWC or a revised partial manuscript and a promotional outline of the entire book. The latter option was more feasible for Goldsmith, and she decided to pursue Maurizio's assistance.

In March 1990, Maurizio declined two requests from Goldsmith to "write the outline." (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 19:8–15, 22:17–23:10, 24:11–14). On April 7, 1990, Goldsmith "got down on her hands and knees and begged" Maurizio to work with her, telling her it would be "a big opportunity for both of [them]." (Pl.Ex. 2, Maurizio 6/10/93 Dep. at 238:12–239:3). On that date, Maurizio agreed to "give it a shot." (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 26:13–15). According to Brendan Gunning, Maurizio's friend, Goldsmith was excited to work with Maurizio because Maurizio would be able to help Goldsmith structure the plot and had the mechanics that Goldsmith lacked for putting together a novel. (Pl.Ex. 8, Gunning Dep. at 36:7–16). Goldsmith told Gunning at that time that Maurizio was "going to plot the book and do the outline." (*Id.* at 37:1–5).

According to Maurizio, Goldsmith proposed to pay her $10,000 to work on the outline, regardless of whether it was successfully sold. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 26:20–27:12). At various times Goldsmith told Maurizio that if the book were sold, they would both "make a lot of money off of [the] book" and "be rich." (*Id.* at 32:19–33:14; Pl.Ex. 4, Maurizio 8/13/97 Dep. at 519:7–11). Also, Goldsmith promised to introduce Maurizio "as a co-writer of the novel and the outline of the novel" to Zuckerman. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 198:12–199:7).

### B. Goldsmith and Maurizio Begin to Work Together

At the time that Goldsmith and Maurizio agreed to work together, Goldsmith had completed drafts of a dozen early chapters of FWC, and Maurizio used these chapters to start the outline. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 46:9–17). On April 10, 1990, Goldsmith and Maurizio met for several hours at Maurizio's home. (*Id.* at 49:3–4). On that day Goldsmith prepared a document called the "Outline for the Outline," (*see* Pl.Ex. 11), which she shared

with Maurizio. (Pl.Ex. 7, Goldsmith 9/28/98 Dep. at 298:21–300:6). The two discussed characters to be created, the characters' personalities, how to proceed on the chapters yet to be written, and "how to fill in the blanks and ... get to [certain] points." (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 49:19–50:8). They also discussed the placement of certain characters in certain chapters and performed an exercise of simultaneously writing a few paragraphs to compare each other's writing. (*Id.*).

From April 10–20, they began writing outlines for the next few chapters, and attempted to construct one-sentence descriptions for subsequent chapters. (*Id.* at 57:10–58:5). They then considered what other chapters needed to be created or rearranged. (*Id.*). Maurizio took notes of their conversations and wrote new sections of the outline expressing the ideas they generated. (*Id.* at 60:8–61:12). Maurizio would show portions of the outline to Goldsmith as they were written. (*Id.* at 61:3–12). They would then discuss Maurizio's work, and sometimes Goldsmith provided written comments. (*Id.; see also* Pl.Ex. 12 & 13).

## C. Goldsmith Proposes Co–Authorship

On April 20, 1990, Goldsmith presented the completed chapter outlines to Zuckerman. Afterwards, Goldsmith told Maurizio that the meeting with Zuckerman went very well, and that they were both going to "make a lot of money." (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 10:17–11:18). According to Maurizio, Goldsmith presented her with an orchid and proposed that they co-write the entire novel. (*Id.* at 12:4–17). Maurizio understood this to mean that when she co-wrote the novel, she would be credited as a co-author. (*Id.* at 68:21–70:2).

## D. Maurizio's Contributions

Maurizio claims that, from the time she and Maurizio began to work together until May 14, she worked on the outline nearly daily and that she and Goldsmith met or talked about the outline every day. (Pl Ex. 2, Maurizio 6/10/93 Dep. at 346:23–347:9; *see also* Pl.Ex. 16). On May 10, 1990, a 62–page outline was completed. However, before a hard copy was printed, Maurizio mistakenly deleted the entire outline from the computer. Maurizio reconstructed the outline by May 14, 1990. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 161:1–167:8). Goldsmith thanked her for her "heroic retrieval." (*See* Pl.Ex. 18).

On May 15, 1990, Goldsmith delivered the reconstructed outline and about 250 pages of FWC text which she had written to Zuckerman. (Def. Ex. E, Maurizio 12/6/91 Dep. at 168:18–169:2; Def. Ex. B, Goldsmith 12/18/91 Dep. at 135:4–7). A few days later, Zuckerman told Goldsmith that he wanted to make changes to the outline and "be more actively involved in the project." (Pl.Ex. 4, Maurizio 8/13/97 Dep. at 528:5–23).

After delivering the outline to Zuckerman but before receiving feedback from him, Goldsmith gave Maurizio a check for $1,000 for her work. On the memo portion of the check, Goldsmith wrote "for typing services." Maurizio objected to this because she was not a typist. Goldsmith thus wrote her a second check that substituted the word "loan" in the memo portion. They agreed on this term because they planned to settle accounts at a later time. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 83:4–87:17, 89:7–12).

Maurizio contends that she made numerous contributions to the outline. Her efforts allegedly included creating new characters, assisting Goldsmith with the articulation of a premise, constructing ideas or premises of her own which Goldsmith would agree or disagree with, and substantially contributing to the creation and personae of the second wives and the husbands, who were principal characters of FWC. (*See, e.g., id.* at 50:14–68:8, 90:6–104:18, 106:4–123:25, 149:3–159:7). However, Maurizio does not dispute that every

draft of the outline contains the following notation: "The First Wives Club, by Justine Rendal." (*See, e.g.,* Def. Ex. Q).

Beyond her contributions to the outline, Maurizio contends that she wrote two draft chapters of FWC. Maurizio called the first of these "Bad Day at Black Rock." She admits that she "began to write it as an outline and it started to become a chapter." (Def. Ex. E, Maurizio 12/6/91 Dep. at 265:3–4). She first told Goldsmith that she was writing this chapter on April 20, 1990. At that time she gave Goldsmith the first page of the chapter and Goldsmith encouraged her to finish it. Maurizio gave the completed chapter to Goldsmith around April 23, 1990. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 13:8–14:5, 62:9–63:4). Goldsmith read it and made some handwritten comments. (*Id.* at 64:9–15; *see also* Pl.Ex. 14). Around that same time, Maurizio also offered to write, and then wrote, a second chapter, which she called "He–Man and Wonder Woman." Maurizio asserts that she agreed to write the chapter after Goldsmith asked her how she felt about writing sex scenes. Maurizio wrote the chapter and presented it to Goldsmith, who read it and told Maurizio it was terrific. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 67:5–13, 67:24–68:20; *see also* Ex. 15). Around this time, the two agreed that after the outline was completed they would divide up the chapters and go to East Hampton during the summer to complete the novel. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 68:3–8).

### E. Goldsmith Refuses Maurizio Co–Authorship Credit

According to Maurizio, she and Goldsmith always planned to work out a formal co-authorship agreement. On May 15, 1990, Maurizio attempted to formalize their agreement, asking for co-authorship credit and twenty-five percent of the profits from the book. (Def. Ex. E, Maurizio 12/6/91 Dep. at 169:11–170:15). Goldsmith reacted to this request "very badly. She acted shocked, appalled." (*Id.* at 353:10–

15). Maurizio characterized Goldsmith's reaction as "freaking out," (*id.* at 353:22–23), and stated that Goldsmith "absolutely refused to give [her] credit in any way." (*Id.* at 336:14–16). On May 18, 1990, Maurizio again approached Goldsmith about co-authorship credit, but Goldsmith again refused to give her credit. (*Id.* at 354:4–13). On May 21, 1990, Goldsmith told her that Zuckerman wanted a number of changes to the outline, and that Goldsmith was going to "shelve it" for a while. (*Id.* at 354:10–15; Pl.Ex. 1, Maurizio 12/6/91 Dep. at 125:13–126:18). Goldsmith never introduced Maurizio as a co-writer to Zuckerman, as she had promised. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 198:12–199:7).

It is not disputed that the parties never agreed to write the rest of FWC together, and that Maurizio did nothing with respect to FWC after the reconstruction of the outline on May 14, 1990.

### F. Goldsmith's Completion of FWC

On May 21, 1990, Goldsmith told Maurizio that she was going on vacation and indefinitely postponing the writing of the remainder of FWC. (Def. Ex. E, Maurizio 12/6/91 Dep. at 355:4–9). Instead, Goldsmith went to East Hampton with Gunning, and, according to Gunning, he completed writing FWC after discussions with Goldsmith that were based in part on the outline. (Pl.Ex. 8, Gunning Dep. at 63:5–20, 64:20–65:15, 73:1–17).

Maurizio learned about Goldsmith's completion of FWC on January 23, 1991 through an article in the New York Post about Goldsmith's sale of FWC to Paramount. (*See* Def. Ex. K). She demanded a twenty-five percent credit as co-author, (*id.*), but Goldsmith told her that under no circumstances would she give Maurizio co-authorship credit. (Def. Ex. E, Maurizio 12/6/91 Dep. at 130:19–132:5).

In March 1992, when FWC was published, Maurizio obtained a copy of the book and placed marks on it indicating the precise language and ideas that she claims

were hers. (*See* Def. Ex. I). Maurizio claims that her language appears on 27 of FWC's 480 pages, seven of which comprise the chapter "Masters of the Universe," which Maurizio claims is her chapter "He-Man and Wonder Woman." Regarding the other chapter Maurizio allegedly wrote, "Bad Day at Black Rock," Maurizio admits that her chapter appears in FWC in "reworked" form. (Def. Ex. E, Maurizio 12/6/91 Dep. at 422:4–423:21).

## G. Maurizio's Lawsuit in New York State Court

Maurizio commenced an action in the New York State Supreme Court on July 31, 1991. In her verified complaint, she alleged breach of contract, fraudulent inducement, conversion, and unjust enrichment, and demanded an accounting of profits. (*See* Def. Ex. L). As the case progressed, Goldsmith moved for summary judgment, asserting that Maurizio's claims were preempted by the Copyright Act. Maurizio denied that her claim was one under the Copyright Act. For example, Maurizio's brief in opposition to Goldsmith's motion for summary judgment in the state court action stated that: "Plaintiff does not contend . . . that she possesses or has a right to possess a copyright under the Copyright Act. Nor does she contend that defendant has infringed on any of her rights under the Copyright Act." (*See* Def. Ex. M at 29). After Maurizio's action was dismissed because the state court found her action was indeed preempted, she appealed the decision, arguing in part that:

> Maurizio does not contend . . . that she possesses or has a right to possess a copyright under the Copyright Act. Nor does she contend that [Goldsmith] has infringed any of her rights under the Copyright Act. . . .
>
> . . . Maurizio is neither claiming to be a joint author of *The First Wives Club* nor that [Goldsmith] infringed [a] copyright or copyrightable expression created by Maurizio.

(Def. Ex. N at 24). Maurizio's appeal failed. She subsequently filed her complaint in this Court on June 12, 1996. (*See* Pl Ex. P).

## H. Maurizio's Copyright Registration

On June 10, 1996, Maurizio registered a claim for copyright in her work. The stated title of the work is "Contributions to the Novel Entitled First Wives Club." (*See* Def. Ex. O). The nature of authorship is identified as "Detailed outline, two complete chapters," and Maurizio is listed as the author. (*Id.*)

## DISCUSSION

### A. Statute of Limitations

■ Goldsmith argues that Maurizio's claims under the Copyright Act are barred by the Copyright Act's statute of limitations. Actions under the Copyright Act must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). A claim "accrues when a plaintiff knows or has reason to know of the injury upon which the claim is premised." *Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir.1996). Maurizio became aware on January 23, 1991, that FWC had been sold to Paramount. (*See* Def. Ex. K). Her claims under the Copyright Act thus accrued on that date. Her claims were not filed in this Court until June 12, 1996, nearly five and one-half years later. Clearly, by then, the Copyright Act's statute of limitations had passed.

Maurizio argues that the New York savings statute, N.Y. C.P.L.R. § 205 ("Section 205"), preserved her claim for six months following the dismissal of her state court action. Section 205 provides, in pertinent part:

> § 205. Termination of action
>
> (a) New Action by plaintiff. If an action is timely commenced and is terminated . . . the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the

termination provided that the new action would have been timely commenced at the time of commencement of the prior action and that service upon defendant is effected within such six-month period. N.Y. C.P.L.R. § 205(a). Maurizio did indeed file her claim in this Court within six months of the dismissal of her state court action.

■ Maurizio's argument fails, however, because this Court holds that a state savings statute such as Section 205 cannot toll the Copyright Act's statute of limitations. Congress has "determined that three years is the appropriate amount of time required to ensure fairness to alleged infringers," and states are without power to overrule that determination. *American Soc'y of Composers, Authors, & Publishers v. Pataki*, 930 F.Supp. 873, 879 (S.D.N.Y. 1996). The Copyright Act's statute of limitations "promotes the principles of repose integral to a properly functioning copyright market," *Levy*, 92 F.3d at 57, and to allow state statutes to affect the amount of time allowable for bringing a claim would undermine the Congressional purpose of uniformity.

This Court finds ample case law to support its conclusion. In *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338 (5th Cir. 1971), the Fifth Circuit affirmed the district court's dismissal of a copyright infringement claim based on statute of limitations grounds. *Id.* at 339–340. The court rejected the appellant's argument that the district court should have applied the Florida Blameless Ignorance rule to toll the three-year statute of limitations. *Id.* at 339. In its reasoning, the court emphasized the purpose of the Copyright Act's statute of limitations:

Prior to 1957 there was no statute of limitations on civil suits relating to copyright infringement, and courts applied the law of the state in which the action was brought. This led to a wide divergence of time periods in which infringement suits could be brought in the various states and thus encouraged forum shopping. The Senate report on the bill which became the limitations statute leaves no doubt that the purpose of the legislation incorporating the three year limitations period was to provide a uniform federal period of limitations applicable throughout the United States.

*Id.* at 339–340. The court recognized that general equitable considerations might call for tolling of the statute, but further stated that:

These equitable considerations must be derived from general principles applicable to every federal forum, not those particular to a local jurisdiction, if the announced purpose of providing a uniform limitations period throughout the United States is to be achieved. In short, the federal statute seeks to nationalize the copyright statute of limitations, but if each state can fetter, condition, and entail its effect, we end with a parochial instead of a national statute. We refuse to frustrate the Congressional goal of homogeneity.

*Id.* at 340.

Other federal case law from this and other circuits involving the Copyright Act and other federal statutes further supports this Court's holding. *See, e.g., Pipkin v. United States Postal Serv.*, 951 F.2d 272, 274–75 (10th Cir.1991) (refusing to apply state tolling provision to Federal Tort Claims Act, stating that "Congress has expressly stated the applicable limitation period for FTCA claims and reference to state law is therefore inappropriate."); *Swarthout v. Michigan Bell Tel. Co.*, 504 F.2d 748, 749 (6th Cir.1974) (rejecting attempted application of Michigan fraudulent concealment statute to toll Federal Communications Act statute of limitations because it "would defeat the national uniformity Congress intended."); *Bergman*, 930 F.Supp. at 879 (holding that a notice requirement in a New York statute conflicted with the Copyright Act's statute of limitations and stating that "the state has no power to resist Congress's determina-

tion of fairness as embodied in the federal statute of limitations."); *Jones v. United States*, 126 F.Supp. 10, 12 (D.D.C.1954) (refusing to apply New York savings statute to preserve a claim under the Federal Tort Claims Act, reasoning that "the statute of limitations contained in the United States Code governs this case, and ... the New York statute has no application.").

Moreover, New York state courts have acknowledged that Section 205 does not serve to toll the statute of limitations contained in a federal statute. For example, in *East 7th St. Realty Corp. v. Damm*, 196 Misc. 920, 96 N.Y.S.2d 118 (N.Y.Sup.App. Term 1949), the Appellate Term affirmed the municipal court's dismissal of a claim for failure to timely file suit under the Housing and Rent Act of 1947. The Appellate Term reasoned as follows:

> The period of limitation set up [in the Housing and Rent Act] is regarded as a matter of substance limiting the right as well as the remedy, and the filing of a suit within the prescribed period of one year is a condition precedent to recovery.... Such period of limitation may not be extended or modified by a State statute, i.e., Section 23 of the Civil Practice Act [the precursor to Section 205].

*Id.* at 118–19 (citations omitted). *See also Central Asphalt v. Industrial Bank of Utica*, 3 Misc.2d 971, 153 N.Y.S.2d 892, 894 (N.Y.Sup.Ct.1956) ("The period of limitation [in the Miller Act] must be regarded as a matter of substance limiting the right as well as the remedy and the commencement of a suit within the prescribed period of one year is ... a condition precedent to recovery. Such period of limitation may not be extended or modified by State Statute.").

█ This Court recognizes that, while Section 205 does not apply here, "[t]he copyright infringement statute of limitations may be equitably tolled if justified under the circumstances." *Kregos v. Associated Press*, 795 F.Supp. 1325, 1330 (S.D.N.Y.1992). To support her argument that such equitable concerns exist in this case, Maurizio points to the Supreme Court's opinion in *Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965). In *Burnett*, the Supreme Court held that the filing of a Federal Employers' Liability Act ("FELA") action in state court was sufficient to toll the FELA statute of limitations. FELA provides for concurrent state and federal court jurisdiction, and the plaintiff in *Burnett* had commenced an FELA action in state court within the three-year statute of limitations. The Court found that the plaintiff "did not sleep on his rights but brought an action within the statutory period in the state court of competent jurisdiction.... [Plaintiff], then, failed to file an FELA action in the federal courts, not because he was disinterested, but solely because he felt that his state action was sufficient." *Id.* at 429, 85 S.Ct. 1050.

█ *Burnett* is inapposite here because Maurizio did not bring her Copyright Act claims in state court, nor could she have. Federal district courts have exclusive jurisdiction of copyright cases. 28 U.S.C. § 1338(a). While the plaintiff in *Burnett* asserted his rights under FELA within that legislation's statute of limitations, Maurizio did not assert her rights under the Copyright Act until the three-year statute of limitations had passed. Thus, Maurizio did indeed sleep on her rights under the Copyright Act, and this Court does not find any equitable reasons to toll the statute of limitations.

█ Maurizio has asserted two claims under the Copyright Act: copyright infringement and joint authorship. Regarding her copyright infringement claim, Maurizio may still recover for acts of infringement occurring within three years of the filing of this suit, though her claim is disallowed as to earlier infringing acts. *See Levy*, 92 F.3d at 57 n. 8; *Stone v. Williams*, 970 F.2d 1043, 1049–50 (2d Cir. 1992). Maurizio's joint authorship claim is barred in its entirety, since "plaintiffs

claiming to be co-authors are time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration." *Levy,* 92 F.3d at 56.

## B. Judicial Admissions

Goldsmith argues that Maurizio's lawyers in the state court action made certain statements that serve as judicial admissions that Maurizio is not a joint author, has no right to possess a copyright, and does not have a claim for copyright infringement. Goldsmith contends that these statements are binding on Maurizio and thus defeat her claims in this action. This Court disagrees.

■ "A court can appropriately treat statements in briefs as binding judicial admissions of fact." *Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir.1994) (citations omitted); *see also In re Velasquez,* 19 I & N Dec. 377, 382 (B.I.A.1986) ("Absent egregious circumstances, a distinct and formal admission made before, during, or even after a proceeding by an attorney acting in his professional capacity binds his client as a judicial admission"), *cited with approval in Ali v. Reno,* 22 F.3d 442, 446 (2d Cir.1994). Judicial admissions are "formal concessions [that are] binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention.'" *Guadagno v. Wallack Ader Levithan Assoc.,* 950 F.Supp. 1258, 1261 (S.D.N.Y.1997) (quoting *Keller v. United States,* 58 F.3d 1194, 1199 n. 8 (7th Cir.1995)).

■ Goldsmith argues that, in state court, Maurizio "repeatedly ... insisted that she is not a joint author under the Copyright Act, that she does not claim a right to possess a copyright in any material related to the Novel, and that she does not claim that [Goldsmith] committed copyright infringement." (Goldsmith Br.

at 21). While Maurizio's attorneys did make such statements in their state court briefs, Goldsmith's argument "relies on a misunderstanding of the nature of judicial admissions, which are statements of fact rather than legal arguments made to a court." *New York State Nat'l Org. for Women v. Terry,* 159 F.3d 86, 97 n. 7 (2d Cir.1998). Placing the statements in context, this Court finds that it would be improper to treat them as binding judicial admissions.

The statements were made in relation to Goldsmith's motion for summary judgment in the state court action, which was based in part on an assertion of lack of subject matter jurisdiction because of preemption by the Copyright Act. In defending against this motion and also in appealing the state court's decision to grant the motion, Maurizio argued that her claim in the state court was not one for copyright infringement or joint authorship. For example, Maurizio's brief in response to Goldsmith's motion stated in part:

> Plaintiff *does not contend* ... that she possesses or has a right to possess a copyright under the Copyright Act. *Nor does she contend* that defendant has infringed any of her rights under the Copyright Act....

(Def. Ex. M at 29 (emphasis added)). Maurizio's appellate brief contained similar statements, such as that Maurizio was "not bringing a claim for copyright infringement, nor is she claiming that she has a right to a copyright." (Def. Ex. N at 33).

This Court holds that these statements are not the type of "clear and unambiguous admission[s] of fact" which have a binding effect on a party. *United States v. McKeon,* 738 F.2d 26, 30 (2d Cir.1984). Rather, they are more properly construed as legal arguments "asserting that the elements of the causes of action alleged in the state court did not include a claim based on a copyright interest," as Maurizio contends. (Maurizio Br. at 19). This Court will not transform such legal arguments into judicial admissions, and thus, these

statements do not serve as grounds for granting Goldsmith's summary judgment motion.

## C. Copyright Act Claims

This Court has held that the statute of limitations provides grounds for dismissal of Maurizio's joint authorship claim and grounds for limitation of her copyright infringement claim. Beyond the statute of limitations argument, however, Goldsmith argues that summary judgment is proper as to both of these claims because there are no genuine issues of material fact and Goldsmith is entitled to judgment as a matter of law. This Court disagrees. Maurizio's claim for joint authorship will be addressed first.

### 1. Joint Authorship

■■■ Maurizio's second claim is for joint authorship under the Copyright Act and an accounting in connection therewith. The Copyright Act defines a "joint work" as follows:

> [A] work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

17 U.S.C. § 101. The Second Circuit has established a two-part test for joint authorship, whereby each putative co-author must have (1) intended, at the time of creation, to be a co-author and (2) made independently copyrightable contributions to the work. *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir.1998); *Childress v. Taylor*, 945 F.2d 500, 507–08 (2d Cir.1991); *Lindsay v. The Wrecked & Abandoned Vessel R.M.S. TITANIC*, No. 97 Civ. 9248(HB), 1999 WL 816163, at *6 (S.D.N.Y. Oct. 13, 1999). Goldsmith argues that there is no genuine issue of material fact as to either element of the test, and that she is entitled to judgment as a matter of law. For the reasons that follow, this Court holds that judgment as a matter of law is improper as to both elements.

#### a. Intent

"Focusing on whether the putative joint authors regarded themselves as joint authors is especially important in circumstances . . . where one person is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another are joint authors." *Childress*, 945 F.2d at 508. In this case, Goldsmith is indisputably the dominant author. She contends that Maurizio has failed to present sufficient evidence that Goldsmith intended FWC to be co-authored by Maurizio. For the following reasons, this Court finds that a genuine issue of material fact exists regarding Goldsmith's intent.

Maurizio has proffered sufficient evidence that, during the time that she made her contributions, Goldsmith intended Maurizio to be a co-author of FWC. On April 20, 1990, Maurizio contends that Goldsmith, orchid in hand, asked her to co-write the novel, at the same time renewing an earlier promise that they would both "make a lot of money" from the book. (Pl.Ex. 1, Maurizio 12/6/91 Dep. at 10:17–12:17). From that date until May 10, 1990, Maurizio allegedly worked on the outline and wrote two draft chapters. There is no evidence that Goldsmith changed her mind about co-authorship until May 15, 1990, when she rejected Maurizio's request for co-authorship credit and twenty-five percent of the profits from the book. (Def. Ex. E, Maurizio 12/6/91 Dep. at 169:11–170:15). Goldsmith's April 20 request and her subsequent silence about co-authorship until May 15 constitute evidence upon which a trier of fact could reasonably find intent of joint authorship by Goldsmith during the time that Maurizio made her contributions.

Goldsmith argues that the Second Circuit holdings in *Childress* and *Thomson* mandate summary judgment. However, these cases are distinguishable from the present case. In *Childress*, the Second Circuit upheld the district court's grant of summary judgment to plaintiff Childress

as to defendant Taylor's joint authorship counterclaim. The Second Circuit agreed with the district court that "there is no evidence from which a trier of fact could infer that Childress had the state of mind required for joint authorship. . . . There is no evidence that Childress ever contemplated, much less would have accepted, crediting the play as 'written by Alice Childress and Clarice Taylor.'" *Childress*, 945 F.2d at 509. In the present case, however, Goldsmith's April 20 proposal constitutes the type of evidence lacking in *Childress.*

In *Thomson*, the Second Circuit upheld the district court's conclusion, made after a bench trial, that Thomson, a dramaturg, was not a joint author of the Broadway musical *Rent.* 147 F.3d at 199. Among the evidence that Thomson offered to show that the author, Larson, intended the play to be a joint work was a statement Larson had made to Thomson that he would "'always acknowledge [Thomson's] contribution'" and "'would never say that [he] wrote what [Thomson] did.'" *Id.* at 205. The Second Circuit upheld the district judge's determination that Larson's statement was consistent with the view that Larson was the sole author of *Rent. Id. Thomson* fails to mandate summary judgment in the present case for two reasons. First, the district judge had made his determination after a bench trial, not on a motion for summary judgment. Second, Goldsmith's request that Maurizio co-author FWC with her, made before much of Maurizio's work on the outline and draft chapters of FWC, constitutes stronger evidence of intent than the statement attributed to Larson in *Thomson.* Indeed, a trier of fact could reasonably find intent based on Goldsmith's April 20 request that Maurizio co-author FWC, followed by Maurizio's work on the outline and draft chapters until May 10, 1990.

**b. Copyrightable Contribution**

Even if Maurizio establishes the requisite intent on Goldsmith's part, Maurizio's asserted contributions to FWC must be copyrightable. Copyright protection extends to "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). For the following reasons, this Court finds that genuine issues of fact exist as to the copyrightability of Maurizio's contributions that render summary judgment improper.

 As noted above, only tangible forms of expression are protected by the Copyright Act. "Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1072 (7th Cir.1994); *see also Attia v. Society of New York Hosp.*, 201 F.3d 50, 53–54 (2d Cir. 1999) (noting that "[a] copyright . . . protects not the author's ideas, but only her expression of them"); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) (same). Maurizio contends not only that her ideas and suggestions were incorporated into FWC, but also that some of her language, that is, her expression, appears in the novel. While her ideas and suggestions are not copyrightable, language which she produced as a tangible form of expression (in the outline or draft chapters) and which was intended to and did indeed merge with Goldsmith's work in FWC may be copyrightable. Maurizio claims that her language appears on 27 of FWC's 480 pages, (*see* Def. Ex. I), and much of this language appears in the outline and draft chapters. Most notable is the language in the FWC chapter "Masters of the Universe," (*see* Def. Ex. I) which Maurizio alleges she originally wrote in her draft chapter "He–Man and Wonder Woman." (*See* Def. Ex. I, Pl.Ex. 17). Thus, this Court holds that at least some of the language allegedly contributed by Maurizio is copyrightable. Whether and to what extent the language is indeed Maurizio's expression is an issue of fact not properly considered at this time.

 For a contribution to be copyrightable, originality is also required. To be original, an author's work must (1) be independently created by the author and

(2) possess at least a minimal degree of creativity. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 681 (2d Cir.1998). "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude humble or obvious' it might be." *Feist*, 499 U.S. at 345, 111 S.Ct. 1282 (citing 1 M. Nimmer & D. Nimmer, Copyright § 1.08[C][1] (1990)). Applying these standards to the facts of this case, the question of whether the language was independently created by Maurizio is disputed, and thus one for the trier of fact. Further, this Court holds that at least a portion of the language Maurizio claims as hers contains a sufficient degree of creativity. In sum, questions remain as to the originality of Maurizio's contributions which make summary judgment improper at this time.

### c. Goldsmith's Derivative Work Argument

■ Goldsmith argues that even if Maurizio was a joint author of the outline and draft chapters, she was not a joint author of FWC itself because the novel is Goldsmith's derivative work of these earlier joint works. (Def. Br. at 31–33). In *Weissmann v. Freeman*, the Second Circuit held that "[e]ven though one co-author has the right to revise a joint work in order to create an individual derivative work, the other co-author acquires no property rights in the newly created work prepared without his involvement." 868 F.2d 1313, 1318 (1989) (citations omitted). Goldsmith also points to *Ashton–Tate v. Ross*, where the Ninth Circuit held that "[j]oint authorship in a prior work is insufficient to make one a joint author of a derivative work." 916 F.2d 516, 522 (9th Cir.1990).

This argument fails because, considering the evidence, a trier of fact could reasonably find that, at the time Maurizio made her contributions to the outline and draft chapters, both parties intended that these contributions were being made as part of the development of FWC itself, and that some of Maurizio's contributions might be "merged" with Goldsmith's work in FWC. In other words, the parties did not necessarily intend that the outline and draft chapters were simply ends in themselves. Rather, they may have been intended to be a part of the process of completing the final product—FWC. This was not the situation in either *Weissmann* or *Ashton–Tate*.

Further, even if no reasonable trier of fact could find Maurizio to be a joint author of FWC (considering it as distinct from the underlying works, as Goldsmith's derivative work argument does), summary judgment would be improper because a joint author must account to his co-author for use of their joint work in a derivative work. *See Weissmann v. Freeman*, 868 F.2d 1313, 1318; *see also Ashton–Tate*, 916 F.2d at 522. Thus, Goldsmith would have to account to Maurizio for Goldsmith's use of the outline and draft chapters in constructing FWC.

### 2. Copyright Infringement

■ Maurizio's first claim, argued in the alternative to her joint authorship claim, is for copyright infringement of the outline and draft chapters which she purportedly created. "To prevail in an action for copyright infringement, 'a plaintiff must show [1] ownership of a valid copyright and [2] the defendant's infringement by unauthorized copying.'" *Debitetto v. Alpha Books*, 7 F.Supp.2d 330, 333 (S.D.N.Y.1998) (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139 (2d Cir.1992)). If unauthorized copying occurred, the "'plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity [of] protected material exists between the two works.'" *Id.* (quoting *Laureyssens*, 964 F.2d at 140).

Goldsmith argues that "the minimal bits of expression claimed by Maurizio, much of which consists of only sentence fragments, are not independently copyrightable and, accordingly, not subject to infringement." (Goldsmith Br. at 33). However, the "minimal bits of expression" that Goldsmith points to are not the *source* of infringement here, but rather the alleged *product* of infringement. The *sources* of the infringement are the 62–page outline and draft chapters allegedly written by Maurizio.[2]

This Court does hold that, under Maurizio's version of the facts in this case, the outline was jointly authored by Maurizio and Goldsmith. "[A]n action for infringement between joint owners will not lie because an individual cannot infringe his own copyright." *Weissmann*, 868 F.2d at 1318. Therefore, the outline in this case cannot be a source of infringement. A successful infringement claim must be based on the draft chapters which Maurizio allegedly wrote.

As discussed *supra*, copyright protection extends to original, tangible forms of expression. The draft chapters pass this test. Further, there appears to be little question that at least some copying occurred. This Court cannot say that the works are not substantially similar. Further, even though the language at issue constitutes a very small portion of the complete novel of FWC, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.1936) (Hand, J.); *accord Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 72 (2d Cir. 1999). Thus, summary judgment will not be granted on the grounds that Maurizio has not sufficiently supported her copyright infringement claim.

### D. Lanham Act Claim

Maurizio's third claim is for violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Goldsmith's sole argument for dismissal of this claim is that "[b]ecause this claim pivots on establishing that Maurizio is a co-author, it fails for the same reasons that the second count [for joint authorship] fails." (Goldsmith Br. at 24).

As already decided, the Copyright Act's statute of limitations is the sole grounds for dismissal of the joint authorship claim. Thus, though the joint authorship claim itself is dismissed, the evidence that Maurizio has submitted in support of that claim can still be used to support her other claims, including the Lanham Act claim. Therefore, summary judgment on the Lanham Act claim is denied.

### E. State Law Claims

#### 1. Wrongful Misappropriation of Novel and Original Literary Ideas

Maurizio's fourth claim is for wrongful misappropriation of novel and literary ideas. Goldsmith argues that this claim "is an echo of Maurizio's efforts in the state court action to avoid the Copyright Act," and is thus preempted by the Copyright Act. (Goldsmith Br. at 24).

This Court holds that Maurizio's misappropriation claim is not preempted. As already noted, the Copyright Act provides protection for the expression of ideas, not the ideas themselves. Courts in this circuit have noted that, where a Copyright Act claim is found to be lacking (which Goldsmith argues is the situation in this case), a claim such as misappropriation may lie. *See, e.g., Past Pluto Prod. Corp. v. Dana*, 627 F.Supp. 1435, 1445 n. 10 (S.D.N.Y.1986) (noting that while the plaintiff did not assert a claim for misappropriation, "it appears that a misappropriation claim ... would not have been preempted, insofar as such a claim would have been based on defendants' misappro-

---

**2.** In the section of this opinion considering joint authorship, this Court has already held that the expressions in FWC that Maurizio asserts to be hers are copyrightable.

priation of plaintiff's idea, a subject matter beyond the scope of copyright law."); *Whitfield v. Lear*, 582 F.Supp. 1186, 1189 (E.D.N.Y.) (finding that "[p]laintiff here claims an infringement of his ideas, which are non-copyrightable. Given the ... legislative history, it is unlikely that these claims are preempted by the Copyright Act"), *rev'd on other grounds*, 751 F.2d 90 (2d Cir.1984). This Court agrees with these courts and holds that, since the Copyright Act protects expressions of ideas and not ideas themselves, Maurizio's misappropriation claim is not preempted by the Copyright Act.

"Although copyright protection does not extend to an author's ideas, New York law, in contrast, recognizes that an individual can have a protectable property interest in an idea which is novel and original." *Paul v. Haley*, 183 A.D.2d 44, 588 N.Y.S.2d 897, 902 (N.Y.App.Div.1992) (citations omitted). Because this Court finds that Maurizio's misappropriation claim is not preempted by the Copyright Act, Goldsmith's motion for summary judgment of this claim is denied.

### 2. Common Law Unfair Competition

The sole reason asserted for dismissal of Maurizio's unfair competition claim is that the claim pivots on the allegations of infringement or joint authorship. This claim thus survives Goldsmith's motion for the same reasons that the Lanham Act claim survives.

### 3. Violation of New York General Business Law Sections 349 and 350

 Maurizio's sixth and seventh claims allege violations of New York General Business Law Sections 349 and 350. In arguing for summary judgment on these claims, Goldsmith cites to *Netzer v. Continuity Graphic Assoc.*, where the court stated that:

Section 349 is a consumer protection act, designed to "combat ... recurring transactions of a consumer type." ... Section 349 generally prohibits only

those deceptive practices affecting the public at large. "Private transactions not of a recurring nature or without ramifications for the public at large" do not fall within the purview of section 349.

963 F.Supp. 1308, 1323 (S.D.N.Y.1997) (internal quotations and citations omitted). Section 350, which concerns false advertising, is also a consumer protection provision.

Maurizio has not disputed Goldsmith's arguments regarding these two claims, and this Court finds the reasoning in *Netzer* applicable to both of Maurizio's New York General Business Law claims. Thus, these claims are dismissed.

### 4. Constructive Trust

Finally, because a number of Maurizio's other claims survive, her claim for imposition of a constructive trust will also be retained.

### CONCLUSION

To summarize:

Goldsmith's motion for summary judgment is granted as to the following: (1) the joint authorship claim (Count two), (2) the copyright infringement claim so far as it involves any alleged acts of infringement that did not occur within three years prior to the filing of Maurizio's complaint in this Court (Count one), and (3) the claims under New York General Business Laws Sections 349 and 350 (Counts six & seven).

Summary judgment is denied as to the following: (1) the copyright infringement claim so far as it involves alleged acts of infringement occurring within three years of the filing of the complaint in this Court (Count one), (2) the Lanham Act claim (Count three), (3) the claim for wrongful misappropriation of novel and original literary ideas (Count four), (4) the claim for common law unfair competition (Count five), and (5) the claim for imposition of a constructive trust (Count eight).

No just cause for delay appearing, the Clerk is directed to enter judgment in favor of defendant, against plaintiff, dismissing Counts two, six, and seven of the Complaint.